OPINION
Lawrence and Carol Tuckosh filed cross-appeals from the decision of the Harrison County Common Pleas Court entered in their divorce action. Both parties assign multiple issues for our review including income levels, the amount, length and nonmodifiability of spousal support, the amount of child support, the valuation of the family business, the manner of property distribution, an award of attorney fees, the transportation of the children for visitation purposes, health care expenses, and the amount of the temporary support orders. For the following reasons, some issues are affirmed, some are remanded, and some must be reserved due to the remand.
 STATEMENT OF FACTS
The parties were married in July 1991; one child was born in May 1994, and one was born in March 1996. Soon after the marriage commenced, Mr. Tuckosh and a partner opened Cadiz Tool and Machine. In creating the equal partnership, the partner brought with him mortgaged land and a building and Mr. Tuckosh brought in his skills as a machinist. In September 1996, he bought his partner's one-half interest by paying him approximately $120,000 in cash installments. (Tr. 59, 61). Mr. Tuckosh then incorporated the company in April 1996 and became the sole shareholder.
In April 1998, the parties signed a $48,000 mortgage on their marital residence. At the same time, the company received a Small Business Association loan for more than $400,000. In June or July 1998, Mr. Tuckosh moved out of the marital residence. He filed a complaint for divorce in November 1998.
In January 1999, the court ordered Mr. Tuckosh to pay $250 per child per month in temporary child support and $250 per month in temporary spousal support. In September 1999, Mrs. Tuckosh moved to the Cleveland area and began college full-time with the intent of receiving a degree in physical therapy.
Divorce hearings were held before a magistrate on three dates: July 15, 1999, January 4 and 18, 2000. For some reason, an entry was filed whereby the magistrate, all regular visiting judges, and the presiding judge recused themselves from the case. In July 2000, a new judge was appointed to decide the case.
In August 2000, the parties agreed to submit the case to the new judge who would review the transcripts and make credibility determinations solely therefrom. On October 31, 2000, the court filed its decision. Mrs. Tuckosh was designated the residential parent. Mr. Tuckosh was informed that he was responsible for transportation of the children for purposes of his visitation.
The court found that Mr. Tuckosh annually earns approximately $30,000 in salary and $15,000 in perks. The court found that Mrs. Tuckosh had no income and was not expected to generate income within the foreseeable future due to her responsibility for two young children and her full-time college status.
In valuing the company, the court noted that both parties presented expert witnesses whose valuations were widely divergent: the expert of Mr. Tuckosh opined that the company had a negative liquidation value while the expert of Mrs. Tuckosh opined that the liquidation value was $260,000 and that, regardless, the company was worth $345,000. (Tr. 314, 368-369, 389). The court also noted that both relied on inaccurate or unreliable information about the company. The court decided that the company's value relates to anticipated earnings rather that simply a liquidation value of assets minus liabilities. The court then determined that the fair market value of the company is $240,000. The court based its decision on the $120,000 price that Mr. Tuckosh paid his partner and pointed out that the price was arrived at by the two people who were the most knowledgeable about the company's circumstances.
Besides the company, the court stated that the marital property included the marital residence valued at $65,000 but encumbered by a $48,000 mortgage, $5,000 in proceeds from a cattle sale, a $3,500 federal income tax refund check from 1998, and a 1990 Lincoln Towncar with 175,000 miles on it. The court awarded the aforementioned assets equally, except it awarded the car to Mrs. Tuckosh. The value of the company was ordered to be paid to Mrs. Tuckosh in annual installments of $12,000 without interest.
As for multiple credit card balances, the court ordered that Mr. Tuckosh pay this debt and hold Mrs. Tuckosh harmless therefor. The court reasoned that much of the debt was for the company or for his personal expenses and that the rest constituted necessary living expenditures for Mrs. Tuckosh and the children.
The court ordered Mr. Tuckosh to pay $424.54 per child per month in child support. The court also awarded Mrs. Tuckosh $900 per month in spousal support for five years. Finally, Mr. Tuckosh was ordered to pay $5,000 in attorney fees for Mrs. Tuckosh.
Mr. Tuckosh appealed first, becoming the appellant and cross-appellee. Mrs. Tuckosh then appealed, becoming the appellee and cross-appellant. Mr. Tuckosh sets forth six assignments of error. Mrs. Tuckosh sets forth seven assignments of error, many of which contain multiple issues. To facilitate our analysis, we have divided the major topics into headings and subdivided the headings according to the relevant assignments of error.
 PROPERTY DIVISION
Mr. Tuckosh's fourth assignment of error alleges:
 "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT RULED THAT THE VALUE OF CADIZ TOOL AND MACHINE WAS $240,000 AND AWARDED 1/2 OF THAT VALUE AS MARITAL PROPERTY TO CAROL TUCKOSH."
Mr. Tuckosh focuses on his accountant's testimony that the net assets minus the net liabilities equal negative $66,245. Hence, he concludes that the company is worth less than nothing. He notes that many creditors are threatening to sue him and that he has worked out payment plans with them. He states that the company owes the IRS back taxes. He also points out that the court's judgment entry stated that in order to value the company, the court used the $120,000 purchase price that he paid his partner for his one-half interest. However, the court mistakenly stated that the sale took place in April 1998. The sale actually took place in September 1995.[1] Mr. Tuckosh concludes that the value was erroneous because the court believed that the sale was more recent than it actually was.
Before addressing these arguments, we should first set forth Mrs. Tuckosh's seventh assignment of error which provides:
 "THE TRIAL COURT'S UNREASONABLE MARITAL PROPERTY DISTRIBUTION (AMOUNT AND METHOD) IS CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION."
Mrs. Tuckosh first argues that the court should have given more weight to the testimony of her expert who opined that the company was worth $345,000. She then states that the $120,000 paid to buy out the partner's half is not an accurate figure with which to value the business because Mr. Tuckosh also assumed debt for which the partner would have been liable. She states that there was $57,500 in debt at the time of the purchase so the actual purchase of half was $167,500 and the company is worth twice that amount. We note that her expert testified that the assumption of the partner's debt was $28,750 (half of $57,500). (Tr. 298). Mrs. Tuckosh next states that she has no objection to using the 1995 purchase price of $120,000 to establish the value, but she argues that the partner's release from debt must be considered. She urges that debt assumption is the equivalent of paying cash.
Hence, we have Mr. Tuckosh arguing that the court overvalued the company and Mrs. Tuckosh arguing that the court undervalued it. Initially, we note that the report of Mrs. Tuckosh's expert finds that, according to the books, the company had a liquidation value of approximately $133,000 but that the book values did not represent fair market liquidation value of approximately $260,000. Conversely, Mr. Tuckosh's expert stated that the company's liquidation value was approximately negative $66,000 due to the bookkeeper's mischaracterization of a lease as operating rather than financing. This expert then instructed that the equipment lease be characterized as a long-term liability.
However, after mentioning the liquidation value, Mrs. Tuckosh's expert proceeded to estimate the value of the company according to a potential return model of valuation. She concluded the company was worth $345,000 to a potential investor, without allowing a discount for lack of marketability of a closely held corporation. This estimate of worth based on potential earnings was not specifically rebutted by Mr. Tuckosh's expert. Rather, on cross-examination, Mrs. Tuckosh's expert admitted that her estimated value may have been lower had she known that a large customer of the company with a $100,000 accounts receivable went bankrupt and that an attorney had been hired to work out deals with various creditors of the company who had not been timely paid. (Tr. 332-336).
The court disagreed with Mr. Tuckosh's suggestion that liquidation value was the proper method of valuation in this case. This is not an abuse of discretion. The court agreed with the theory of Mrs. Tuckosh's expert, that earnings potential is a valid method of valuation of the company. This is not an unreasonable, arbitrary or unconscionable conclusion. When determining the value of a marital asset, the court is not required to use a particular method of valuation. See, e.g., Zeefev. Zeefe (1998), 125 Ohio App.3d 600, 612 (dealing with valuing a business and evaluating expert testimony thereon).
Although the court agreed with the theory of valuation, the court would not accept this expert's final $345,000 estimate of the company's value on December 1998 due to the fact that it was made without knowledge of particular problems facing the company and it arguably relied on incorrect financial statements which showed $69,000 in profits and which believed there was less debt due to the lease's mislabeling. Instead, the court turned to the $240,000 value set by the original owners of the company, Mr. Tuckosh and his partner, at the time of sale in late 1995.
Contrary to Mrs. Tuckosh's suggestion, the court was not required to consider the assumption of partnership debt as a result of the sale to be equivalent to a cash pay out. As aforementioned, the partner brought mortgaged land into the partnership as his one-half. The court could reasonably assume that the purchase price paid in cash took outstanding debt into consideration and merely listed debt for clarification purposes. Testimony did not sufficiently establish otherwise. To demonstrate her argument of debt assumption as cash in a partnership buy-out, she should have delved further into the transaction during examination of Mr. Tuckosh and his former partner and followed up with expert testimony explaining the theory.
Regardless, conflicting testimony was presented as to whether the value should be inflated or deflated. For instance, testimony established that Mr. Tuckosh paid too much to his partner but wanted him out bad enough to do so. Other testimony established that Mr. Tuckosh did not pay enough but the partner wanted out bad enough to take a lesser amount than deserved.
Before coming to a conclusion on the company valuation, we must remember that the trial court's decision in valuing assets and equitably dividing them is discretionary. Where, as here, we cannot determine from the record the weight given by the trial court to a particular fact in the exercise of the court's discretion, we cannot presume how the court would have interpreted the evidence had it not made a factual mistake in its findings. As aforementioned, the court chose the 1995 purchase price as the current value of the company but seemingly believed that the purchase occurred in April 1998. While we may be tempted to correct the purchase date and then evaluate whether the value was supported by the evidence, we decline to do so based on our reasoning in Young v. Young
(Sept. 21, 2001), Columbiana App. No. 00C043, unreported and based on the fact that we must remand anyway due to an unallocated marital debt which also relies on the Young rationale and which we will discuss infra.
In Young, the court mistakenly found that there was a mortgage on the marital residence. We refused to correct the factual error on the grounds that we would be considering a fact that the court did not in formulating its property division. We noted, "[w]e cannot possibly know the ripple effect on the overall distribution." Id. at 2. Thus, we remanded for the court to correct the factual mistake and reevaluate its property division to determine whether allocations are affected by the correction.
Under this assignment, Mrs. Tuckosh also complains that the trial court failed to mention the company's SBA loan, which it appears both parties signed in April 1998 as joint obligors for more than $400,000. She wishes to be held harmless on this loan since Mr. Tuckosh was awarded the company. In dividing property, the court must consider the value of assets and debts and allocate these values to the parties in an equitable fashion. Where the trial court fails to value and allocate a debt, this court must remand in order that the proper protocol be followed by the proper tribunal. See Id. See, also, Steusloff v. Steusloff (Aug. 6, 1999), Williams App. No. WM98021, to be reported. Although Mr. Tuckosh did not contest Mrs. Tuckosh's desire to be held harmless below or in his appellate brief, it is not our position to determine whether and why she should be held harmless and what effect this proposal may have on other decisions of the court. Hence, the status of the SBA loan must be addressed on remand.
Although we are remanding based on certain specific aspects of property division, other more general aspects of property division should still be addressed as they encompass the starting points for division. Under her seventh assignment of error, Mrs. Tuckosh complains that the overall allocation of marital property was inequitable. She urges that the court should have awarded her 75% rather than 50% of the marital property. She claims that she should get an extra 10% for a disparity in earning capacity, another extra 10% since Mr. Tuckosh accumulated Social Security credit during the nine-year marriage, and an extra 5% because Mr. Tuckosh allegedly engaged in marital and financial misconduct. She also complains that the court failed to set forth its reasons supporting the equal distribution.
As the parties recognize, an equal division is the starting point for an equitable division. Holcomb v. Holcomb (1989), 44 Ohio St.3d 128,131. The court may deviate from equal after considering factors such as the duration of the marriage, the assets and liabilities of the spouses, the desirability of keeping the family home, the liquidity of the property and economic desirability of keeping the property intact, tax consequences, and costs of sale. R.C. 3105.171(F)(1)-(8). In this case, the court found that the parties were married nine years, that Mrs. Tuckosh moved to the Cleveland area with the children, that the family home would be sold, and that neither party has assets beyond those listed as marital. The court mentioned hiring a broker to sell the house. The court noted that Mr. Tuckosh was keeping the business as opposed to liquidating it and provided instructions upon sale or liquidation of the company. We thus find that Mrs. Tuckosh's argument that the court failed to consider the factors to be without merit.
We also respond to Mrs. Tuckosh's arguments by noting that the distribution was not actually equal as Mrs. Tuckosh received the Lincoln automobile without a discount in other property. Furthermore, she was held harmless for a substantial amount of credit card debt that Mr. Tuckosh was ordered to pay, much of which was marital debt.
Because none of Mrs. Tuckosh's allegations are specifically listed factors to be considered in R.C. 3105.171(F), Mrs. Tuckosh argues that they should have been considered under the final factor, R.C.3105.171(F)(9), which states, "[a]ny other factor that the court expressly finds to be relevant and equitable." Nonetheless, the court did not expressly find her allegations to be relevant and equitable considerations.
We should note that disparity in earning capacity is not actually established as this capacity evaluation envisions the future and there was no evidence of how much Mrs. Tuckosh will make after graduating with the physical therapy degree that the court is allowing her to pursue without imputing income. Furthermore, she seems to base this disparity argument on her argument, which we overrule infra, that Mr. Tuckosh's annual income is $112,000. This argument contradicts the court's finding that Mr. Tuckosh's income was $45,000. As for marital misconduct, the court did not err in refusing to consider these allegations. Also, it was for the court to determine whether Mr. Tuckosh engaged in misconduct in his sale of the cattle or whether the paperwork prepared by Mrs. Tuckosh overvalued the cattle.
Lastly, we note that the build up of Social Security credits is not a marital asset. Hoyt v. Hoyt (1990), 53 Ohio St.3d 177, fn. 3; Camsky v.Camsky (Aug. 11, 2000), Belmont App. No. 99BA31, unreported, 4. Although not divisible, the value of one spouse's credits is often considered in cases where that spouse seeks distribution of the other spouse's public pension. Okos v. Okos (2000), 137 Ohio App.3d 563, 587. In this case, such a scenario does not exist. Moreover, evidence established that Mrs. Tuckosh worked as a waitress "for a couple of years" during the marriage and thus should have earned some Social Security credits. (Tr. 451). Further, the parties were in their mid-thirties at the time of divorce. Finally, she offers no value of the credits besides the arbitrary extra 10% of all marital property that she believes she is entitled to as an offset of his credits. See Guziak v. Guziak (1992), 80 Ohio App.3d 805,814 (holding no abuse of discretion in failing to address potential Social Security benefits in the almost total absence of evidence on the subject).
Mrs. Tuckosh's sixth assignment of error states:
 "THE TRIAL COURT'S UNREASONABLY RISKY 13 1/2 YEAR DEFERRED DISTRIBUTION OF MARITAL ASSETS IS CONTRARY TO LAW, AND/OR AN ABUSE OF DISCRETION."
The court ordered that Mr. Tuckosh pay Mrs. Tuckosh her $120,000 worth of the company in $12,000 annual installments for ten years without interest. The court also held that if Mr. Tuckosh sells the company, he shall pay Mrs. Tuckosh half of the net proceeds minus any payments already made. Mrs. Tuckosh has many concerns with this method of distribution. She worries that the company will go out of business and she will never receive her half. In some filings, she desires that she be paid in full by June 2002, and in other filings, she asks that she paid in full by May 2003. She believes he can refinance the company at this time because the SBA loan will be less substantial by then. A related contention was contained in her seventh assignment where she argues that the court should have awarded her 10% interest on the deferred distribution of her half of the company. Additionally, Mrs. Tuckosh states that the court abused its discretion in failing to provide security for the deferred distribution by placing a judicial lien on the company.
Although courts prefer a disentanglement of the affairs at the time of divorce or soon thereafter, we cannot say it was an abuse of discretion to order a deferred distribution to be paid in annual installments, especially where the valuation of the company was based on potential earnings. We also cannot say that the court abused its discretion in failing to order a lien against the company in favor of Mrs. Tuckosh. The court ordered that she be paid her share in annual installments, and the court made provisions for her interest upon any future sale.
As for the subject of interest on the deferred distribution, since we are remanding for the court to determine whether it would find the company's value to be different based on the incorrect purchase date, we are unable to determine whether the lack of interest was equitable. We shall note that the Supreme Court has stated that a deferred property award without interest may sometimes be inequitable, but it is not always so since the trial court must consider the circumstances that exist in each case. Koegel v. Koegel (1982), 69 Ohio St.2d 355, 357 (in a case where abuse of discretion was not raised, but rather, the appellant argued that interest was statutorily mandated). The Koegel Court also instructed that the deferred distribution be thought of as it would be in the dissolution of a partnership. Thus, we note that it appears that Mr. Tuckosh paid his partner approximately 6.83% interest on the installments toward the purchase price. We should also direct the court's attention toZeefe, which held that "there is no requirement, moreover, that a trial court award interest on the payment of property division over time, that decision being left to the sound discretion of the trial judge."125 Ohio App.3d at 612 (upholding the lack of interest where the distribution was deferred over six years and the appellate court found that the trial court overcompensated wife in other ways such as its award of two cars to her without discounting the value against her other marital awards).
 CREDIT CARD DEBT
Mr. Tuckosh's sixth assignment of error provides:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING LAWRENCE TUCKOSH TO PAY ALL THE CREDIT CARD DEBT."
The court found that much of the credit card debt was actually that of the company. The court also found that Mr. Tuckosh created much of this debt for his personal expenses. The court then concluded that any debt incurred by Mrs. Tuckosh was for necessities of life for herself and the children both before the parties' separation and after. As aforementioned, equal is a starting point which can be varied to achieve an equitable result. At this point, we find no abuse of discretion; however, we shall reserve the issue due to our remand which may affect the overall property distribution.
 INCOME
Mrs. Tuckosh's first assignment of error alleges:
 "THE TRIAL COURT'S FAILURE TO INCLUDE NET PROFITS OF THE FAMILY BUSINESS IN FAMILY INCOME UPON WHICH CHILD AND SPOUSAL SUPPORT ARE CALCULATED IS CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION."
As aforementioned, the court found that Mr. Tuckosh earned approximately $30,000 in salary and $15,000 in perks in 1998. Mrs. Tuckosh contends that his income should be valued at $112,340 rather than the mere $45,000 figure assigned by the court. She states that he earned $29,360 in salary and $13,800 in perks and that the business netted $69,180 in profits in 1998.
Mrs. Tuckosh's expert testified that the company profits merely represented available income and admitted that it is not advisable for the sole shareholder to withdraw all of the company's net profits. (Tr. 373). But see former R.C. 3113.215(A)(3). Regardless, Mr. Tuckosh's expert and accountant testified that this figure was a mistake by the company bookkeeper and that the company's tax return actually showed a loss rather than profit in 1998. (Tr. 397, 403-404). He notes a variance of $77,000 that the bookkeeper could not explain. Mrs. Tuckosh's expert also confirmed this variance which she described as a discrepancy but which she did not investigate due to the fact that she was only hired to perform a limited evaluation. Based on conflicting testimony and the parties stipulation that the court could determine credibility, we cannot find that the court erred or abused its discretion in refusing to include company profits which allegedly never existed in Mr. Tuckosh's income calculation. This assignment of error is overruled.
 CHILD SUPPORT
Mr. Tuckosh's second assignment of error complains:
 "THE COURT ABUSED ITS DISCRETION IN NOT IMPUTING INCOME TO MRS. TUCKOSH WHEN DETERMINING CHILD SUPPORT."
Under this assignment, he alleges that income should be imputed to Mrs. Tuckosh because she is voluntarily unemployed. He argues that subjective motivations, such as a desire to obtain a college degree, are irrelevant to the determination of whether a person is voluntarily unemployed. He notes that Mrs. Tuckosh testified that she has the ability to make $15,000 to $20,000 per year and she could at least work part-time.
We agree that a parent's subjective motivation for unemployment is unimportant as the reasons for unemployment must be objectively reasonable. Rock v. Cabral (1993), 67 Ohio St.3d 108. In determining if unemployment has an objectively reasonable basis, the court is to examine how the unemployment affects the children as the best interests of the children are paramount. Id.In this case, the court found that the children were young and that it would not impute income to Mrs. Tuckosh which would require her to gain outside employment. The court found that at this time, work would also be incompatible with Mrs. Tuckosh's full-time student status. A court can find that it is in the children's best interests that their mother attend school without working, for a reasonable period of time after the end of the marriage, to create better opportunities. This is not an abuse of discretion. See, e.g., Evans v.Cole (Dec. 15, 2000), Jackson App. No. 00CA03, unreported; Ontko v.Ontko (Nov. 12, 1999), Erie App. No. E99040, unreported; Holt v. Troha
(Aug. 2, 1996), Greene App. No. 96CA19, unreported. As such, this assignment of error is overruled.
Mrs. Tuckosh's second assignment of error alleges:
 "THE TRIAL COURT'S UNREASONABLE PERMANENT CHILD SUPPORT AWARD IS CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION."
Mrs. Tuckosh was awarded $424 per month per child in accordance with the child support worksheet. She believes she is entitled to $1,775 per month per child. Initially, she reiterates her argument about the amount of Mr. Tuckosh's income set forth in her first assignment of error, which we overruled supra. She also bases her figure on her contention that the court should have deviated from the worksheet based on three arguments. First, she states that some United States government publication states that it costs $250 more per month to raise a child than what the worksheet allows. Second, she states that it costs 24% more to live in the Cleveland area, specifically North Ridgeville, than in the Cadiz area. Third, she defines "special needs" as day care. These arguments are without merit.
Based on her first argument, every single obligee could receive a deviation from the legislatively enacted worksheet if they type out an exhibit which purports to contain a government estimate of the cost of raising a child. (See Defendant's Exhibit 22). The court's refusal to deviate from the worksheet based on this estimate is not error.
In regards to her second argument, she submitted xeroxed pages from "Zip Code: The Sourcebook" on the average consumer expenditure on various products in various areas compiled from 1993 and 1994 surveys of the Bureau of Labor Statistics. We note that the products listed include some everyday items but also include things like pet supplies, sporting goods, theater and concerts, and travel. She takes the figures for the listed products and arrives at total figures of 89.7 for the area around Cadiz and 111.2 for the area around North Ridgeville. We note that rather than use the 105.9 figure for North Ridgeville, she averaged it with other higher suburbs to arrive at 111.2. Moreover, the total figures that she contends reflect the different total costs of living are not specified in the exhibit. Rather, she made the calculations and assumptions and typed up an exhibit with her findings. (See page 1 of this exhibit). The court need not accept her layperson evaluation as authoritative. Vancott-Young v. Cummings (May 24, 1999), Warren App. No. CA98-09-122, unreported, 4 (noting that the appellant was not an expert on the relevant cost of living factors).
Regardless, her second argument fails to recognize that no income is attributed to her in the worksheet and it is she who moved to an unrelated city from a town where she has lived for at least nine years. Although it is true that a court may consider cost of living differences when deviating from the child support worksheet, this is done in relation to income levels. Booth v. Booth (1989), 44 Ohio St.3d 142, 143-144. See, also, Odionu v. Odionu (June 13, 2001), Summit App. No. 20390, unreported. The rationale behind cost of living considerations corresponds to income that appears inflated or deflated. For instance, an obligor may move to New York City and earn a salary that is double what he earned in Cadiz. Yet, due to the cost of living increase, the value in the income is not as much as if he received that same raise and still lived in Cadiz. An obligee could make a similar argument, where her income increases due to her move, and seek court consideration that only part of the increase should be treated like a raise due to the increased expenditures to make that money in a certain area. In this case, however, Mrs. Tuckosh received the privilege of having no income imputed to her. Thus, it was not unreasonable for the court to conclude that she failed to rebut the presumption that the guidelines are correct.
Finally, in response to Mrs. Tuckosh's third argument, we disagree with her characterization of day care for one of the children as a special need. The factor to consider states, "special or unusual needs." The mere fact that a child needs child care because his mother desires to attend college does not turn that child into a child with special or unusual needs. In a related vein, the court may have found it hard to believe her testimony that all day cares in Cleveland charge a parent for five days even if the parent only desires three days of day care.
In order to deviate from the guidelines, the court was required to find that the amount from the guidelines would be unjust or inappropriate and not in the child's best interests. R.C. 3113.214(B)(1)(a). It was not unreasonable for the court to find that deviation in favor of Mrs. Tuckosh was not warranted. We also note that certain deviation factors would counteract the factors she claims lean in her favor. For instance, the cost of visitation to Mr. Tuckosh due to her move is a specifically listed factor to consider. We conclude that the court did not abuse its discretion in refusing to deviate from the child support guidelines.
 SPOUSAL SUPPORT
Mr. Tuckosh's first assignment of error contends:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING $900 A MONTH IN SPOUSAL SUPPORT."
Mr. Tuckosh complains about the amount ($900) and the length (five years) of spousal support and the court's failure to reserve jurisdiction to modify the support. Mr. Tuckosh argues the ordered support will raise Mrs. Tuckosh's living standard to one that is higher than the standard that existed during the marriage, noting that she testified that she lived as if in poverty throughout the marriage. He also states that he is unable to pay this much after considering his obligation to pay her $849 per month in child support. He notes that nine years is not a long marriage, that Mrs. Tuckosh is only thirty-six years old, and that one of the children is of school age.
Because we are remanding on specific property division issues, we must refrain from addressing spousal support issues at this time. Young, Columbiana App. No. 00CO43; McClelland v. McClelland (Feb. 25, 2000), Jefferson App. No. 97JE60, unreported; R.C. 3105.171(C)(3); 3105.18(B).
Mrs. Tuckosh's third assignment of error provides:
 "THE TRIAL COURT'S PERMANENT SPOUSAL SUPPORT AWARD IS CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION."
Initially, Mrs. Tuckosh reiterates her argument about Mr. Tuckosh's income set forth in her first assignment of error, which we overruledsupra. Then, she contends that the court failed to specify its reasons for awarding "only" $900 per month. Mrs. Tuckosh now claims that she needs $2,961 per month in spousal support; her post-trial brief asked the court for $3,139 per month in spousal support. She also complains that five years is not long enough because she will not graduate until December 2006. We should point out that this graduation date she proposes corresponds to a masters degree rather than a bachelor's degree. As aforestated, we are not making a determination on spousal support at this time.
Mrs. Tuckosh's fourth assignment of error alleges:
 "THE TRIAL COURT'S UNREASONABLE FAILURE TO AWARD INDEFINITE HEALTH CARE EXPENSES IS CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION."
Mrs. Tuckosh believes that Mr. Tuckosh should be ordered to pay her health care expenses indefinitely or at least through the term of spousal support. Mrs. Tuckosh states that she has degenerative disk problems that Mr. Tuckosh exacerbated by making her carry firewood and by committing an assault on her where he allegedly threw her to the floor. She states that she will be unable to function if she does not receive $460 per month in chiropractic treatments. As this is an aspect of spousal support, we shall not make a ruling at this time.
Mrs. Tuckosh's fifth assignment of error contends:
 "THE TRIAL COURT'S FAILURE TO REMEDY THE UNCONSCIONABLE TEMPORARY FAMILY SUPPORT AWARD IS CONTRARY TO LAW AND/OR AN ABUSE OF DISCRETION."
Mrs. Tuckosh alleges that she and her children lived in poverty at $750 per month ($250 for spousal support and $500 for child support) during the temporary support award which began January 1999. She also makes an allegation that Mr. Tuckosh concealed financial records, most likely to avoid any prohibition on retroactive modification of temporary support as set forth in the case of Jackson v. Jackson (2000), 137 Ohio App.3d 782,800. Hence, she believes that she is entitled to a retroactive modification of temporary support. We disagree.
Initially, we notice that Mrs. Tuckosh did not ask for any certain amounts in temporary support. When the temporary orders were entered, Mrs. Tuckosh had no rent expenses. A court has discretion to order reasonable temporary support. R.C. 3105.18; Civ.R. 75(N)(1). We do not find that $250 per month in spousal support was unreasonable considering that she paid no rent. Although she moved out of the marital residence in September 1999 and began paying $650 per month in rent, she did not ask for a modification of temporary support as provided in Civ.R. 75(N)(2).
As for temporary child support, we note that the parties had shared parenting at the time the temporary child support order was entered. (See Dec. 12, 1998 order). Hence, the fact that permanent child support was ordered at $424 per child, while temporary had only been $250 per child, is not that significant considering that custody went from shared to sole. Furthermore, Mrs. Tuckosh never sought a modification of the temporary child support order as set forth in Civ.R. 75(N)(2). This assignment of error is overruled.
 ATTORNEY FEES
Mr. Tuckosh's fifth assignment of error provides:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING LAWRENCE TUCKOSH TO PAY TO CAROL TUCKOSH $5,000.00 FOR ATTORNEY FEES WHEN THERE WAS A LACK OF EVIDENCE IN REGARD TO THAT ISSUE AND THE FEES WERE UNREASONABLE."
Pursuant to R.C. 3105.18(H), the court may award reasonable attorney fees to one party if the other party has the ability to pay. Mr. Tuckosh alleges that the amount of fees was unreasonable and he does not have the ability to pay $5,000.
As for the reasonableness of the amount of fees, Mrs. Tuckosh's first attorney testified that Mrs. Tuckosh agreed to pay him $150 per hour and that she originally owed him $3,600. He testified that she made some payments and now owes him $2,850. (Tr. 278). Mr. Tuckosh stipulated that $2,000 would be reasonable for this first attorney's services due to the unusually high number of phone calls from Mrs. Tuckosh to her attorney and her need for multiple office conferences. (Tr. 282-283).
Mrs. Tuckosh replaced this attorney in September 1999 with counsel who represented Mrs. Tuckosh at the final two hearings. She testified that she owed new counsel $9,500. A stipulation was then entered that new counsel's fees would be $6,000. (Tr. 498). Mrs. Tuckosh also asked for $4,750 to pay her expert witness and $750 for an appraisal. The court awarded $5,000 in attorneys' fees to Mrs. Tuckosh. Due to the fact that Mr. Tuckosh stipulated to the reasonableness of fees in the amount of $2,000 for the first attorney and $6,000 for the second attorney, he cannot now complain that Mrs. Tuckosh failed to show the reasonableness of this amount.
As for Mr. Tuckosh's ability to pay, the court could have considered that he paid his own divorce attorney out of company funds, that he owns a company which has the potential to be profitable, and that this amount is a reasonable amount of excess spousal support and an equitable end to the marriage. Nonetheless, we do not finalize this portion of the attorneys' fees argument since it is technically an aspect of spousal support which cannot be finalized until the property division is complete.
We note that Mrs. Tuckosh's response brief asks that we increase her fee award to $17,000. However, Mrs. Tuckosh specifically states that she did not assign this as error in her merit brief because she has more important issues to discuss. Hence, her argument is waived on appeal.
 VISITATION TRANSPORTATION
Mr. Tuckosh's third assignment of error contends:
 "THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING LAWRENCE TUCKOSH TO DRIVE BOTH WAYS IN REGARDS TO VISITATION WITH HIS CHILDREN."
Pursuant to R.C. 3109.051(A), there shall exist a just and reasonable order to facilitate the nonresidential parent's visitation rights under conditions as the court directs. Mr. Tuckosh believes that requiring him to drive both ways is unjust. He points out that she is the one who moved seventy miles away to the Cleveland area from the Cadiz area. However, at the first divorce hearing, Mr. Tuckosh lived in Minerva which is a similar distance from Cadiz as is Cleveland. (Tr. 52-53).
We also previously noted that transportation expenses for visitation are considerations for deviating from the child support worksheet. As aforementioned, there could arguably be a competing factor on both sides of deviation, supporting the lack of deviation. Regardless, Mr. Tuckosh proceeds under a specific performance theory rather than a deviation theory. Mr. Tuckosh desires that Mrs. Tuckosh share in actual transportation in order to lengthen his visitation, apparently believing that time spent driving is not time spent visiting.
In response, we state that Mr. Tuckosh has access to company vehicles and drives a sport utility vehicle while Mrs. Tuckosh drives a 1990 Lincoln with 175,000 miles which she categorizes as dangerous. She testified that this car overheats and leaks steering fluid which has previously locked the wheel. She also stated that the car is expensive to maintain due to its luxury car classification. (Tr. 9, 465). Under the circumstances that presently exist in this case, it was not unreasonable for the court to order that Mr. Tuckosh provide transportation to and from his own visitation. This assignment of error is overruled.
For the foregoing reasons, this case is affirmed in part, reversed in part and remanded. On remand, the court is to make determinations regarding the SBA loan, decide whether the mistaken date of purchase affects the court's opinion on the value of the company, and determine if these decisions affect the lack of interest on the deferred distribution, the remainder of the property division or the spousal support. Judgment accordingly.
Donofrio, J., and Waite, J., concurs.
[1] We note that the date of April 1998 corresponds to the date the mortgage on the house and the SBA loan were incurred. It also appears that the court was led to the erroneous date by the proposed findings of fact and conclusions of law filed by Mrs. Tuckosh which mistakenly states that the sale occurred in April 1998.